**In re SPLASH TECHNOLOGY HOLDINGS INC. SECURITIES LITIGATION**

**This Document Applies to: All Actions**

**No. C99–00109 SBA.**

United States District Court, N.D. California.

Aug. 27, 2001.

See, also, 2000 WL 1727405.

---

---

Steven M. Schatz, Gidon M. Caine, Catherine H. Winterburn, Melissa M. Maccarone, Wilson, Sonsini, Goodrich & Rosati, for Splash Technology Holdins, Inc., Splash Technology, Inc., Kevin K. Macgillivray, Joan P. Platt, Timothy D. Kleffman and Christine A. Beheshti.

Timothy K. Roake, David M. Lisi, Devin P. Gensch, David Bartels, Fenwick & West, LLP, for Charles W. Berger, Digital Origin, Inc.

William S. Lerach, Edward P. Dietrich, John K. Grant, Stanley S. Mallison, Milberg, Weiss, Bershad, Hunes & Lerach, LLP, for Meir Kadac, Mark Erickson, Threes B's, Carl Byrd, Joyce Hermanson, Clarence F. Scott, Edward McNulty, and Rugg Garber.

## ORDER

ARMSTRONG, District Judge.

This matter comes before the Court on Splash Defendants' Motion to Dismiss the Second Amended Complaint [Docket No. 126–1]. Having read and considered the papers submitted by the parties, having considered the arguments advanced by the parties, and being fully informed, the Court hereby GRANTS Defendants' Motion to Dismiss, and ORDERS that the Second Amended Complaint shall be dismissed with prejudice.

## I. BACKGROUND

### A. Factual Background

Plaintiffs, all purchasers of Splash Technology Holdings, Inc. stock between January 7, 1997 and October 13, 1998 (the "Class Period") filed this security class action against (1) Splash Technology Holdings, Inc. and its principal operating subsidiary, Splash Technology, Inc. (collectively "Splash" or "the Company"), (2) Kevin K. Macgillivray ("Macgillivray"), the President, Director, and Chairman of Splash, (3) Joan P. Platt ("Platt"), Vice President, Finance and Administration, and Chief Financial Officer of the Company during the Class Period, (4) Timothy D. Kleffman ("Kleffman"), Vice President, Business Development and Product Planning, since July 1997, and Vice President, Engineering Operations, from January 1996 to June 1997, (5) Christine Beheshti ("Beheshti"), Vice President, Software Engineering, (6) Charles W. Berger ("Berger"), and (7) Radius, Inc. ("Radius"), the company who "spun off" one of its divisions to form Splash and who retained a 20% interest in the new entity. (Second Amended Complaint (also referred to herein as "SAC") ¶¶ 1, 15, 38–39) Only defendants Splash, Macgillivray, and Platt join in the current motion. Radius and Berger filed a separate motion. This order refers to the defendants bringing this motion collectively as the "Splash defendants". The more generic term, "defendants", refers to all of the named defendants.

Splash develops, produces and markets color servers that provide an integrated link between desktop computers and digital color laser copiers, and enable such copiers to provide networked color printing and scanning. During fiscal years 1994, 1995, and 1996, Xerox and Fuji Xerox constituted Splash's sole customers. (SAC ¶ 38)

In 1996, Radius spun off one of its divisions, the Color Server Group ("CSG") to form Splash. (SAC ¶ 15) Prior to 1996, Radius had incurred substantial operating losses—$131.7 million in the 1995 fiscal year ("F95"), $77.4 million in F94, and $20.1 million in F93. Independent auditors concluded, in a report for the fiscal year ending September 30, 1995, that Radius' ability to continue as a viable entity was in substantial doubt. Radius' limited cash resources restricted its ability to purchase inventory which in turn limited its ability to manufacture and sell products. (SAC ¶ 14)

The spin-off of CSG into Splash allegedly resulted from an agreement between Berger, the CEO and President of Radius, Gregory Avis ("Avis"), a Managing Partner of Summit Partners, L.P. ("Summit"), Lawrence G. Finch ("Finch"), a General Partner of Sigma Partners, L.P. ("Sigma") and a director of Radius until October 1995, and Macgillivray, who ran CSG. The agreement called for (1) Summit to pay Radius $20 million, (2) Radius to retain a 20% interest in the new entity, Splash, (3) Avis and Berger to serve on Splash' board, and (4) Macgillivray to serve as Splash's CEO and President. (SAC ¶ 15)

On October 9, 1996, Splash announced that it had completed its initial public offering ("IPO"), which raised $26.6 million. According to the terms of the IPO, Splash insiders agreed to a "lock-up", *i.e.*, that they would not sell any additional shares of their Splash stock onto the open market for 180 days from the date of the IPO.

(SAC ¶¶ 16–17) Although the value of Splash's stock increased swiftly from its opening price of $11 per share to a high of $38 per share on January 31, 1997, Splash insiders could not reap the benefits of this growth since the lock-up provision prevented them from selling their stock. As the deadline for the expiration of the lock-up provision approached, however, the value of the shares had fallen. By April 1, 1997, approximately one week before the expiration of the IPO lock-up, the value of the stock had dropped to $22.375 per share. (SAC ¶¶ 17–18)

With the expiration of the lock-up provision imminent, the defendants allegedly hatched a plan to "artificially re-inflate" Splash's stock. (SAC ¶ 18) The focal point of the defendants' allegedly fraudulent scheme was a Secondary Public Offering of Splash stock. In addition to legal and strategic advantages, the Secondary Offering allegedly promised Splash the opportunity to raise substantial capital on favorable terms that would help carry it through a downturn in business and prospects that defendants allegedly knew was coming, while simultaneously permitting Splash insiders an opportunity to line their pockets before negative information about Splash became public. (SAC ¶ 18)

Throughout the spring and summer of 1997, prior to the Secondary Public Offering, defendants allegedly made a number of false and misleading statements designed to boost the price of the stock. One frequent representation during this period was that Splash expected to increase its revenue and earnings at a rate of 35% or more annually. The "true facts" allegedly known by defendants at the time of this prediction refuted this prediction. By February 1997, defendants allegedly knew that Fuji Xerox was only forecasting 10% growth. Sometime during the summer of 1997, defendants allegedly learned

that Fuji Xerox had grown only 5% in the June quarter of that year. Because Fuji Xerox allegedly accounted for 60% of Splash's sales, defendants thus allegedly knew that attaining the sales growth projected was virtually impossible. (SAC ¶ 21)

Defendants' statements allegedly succeeded in that the value of Splash's stock reached a per share value of more than $43 by July of 1997. A roadshow followed this rise in Splash's stock. During this roadshow, Splash officers Macgillivray and Platt allegedly made new false and misleading statements. (SAC ¶¶ 20–21)

On August 20, 1997, the Secondary Public Offering resulted in a sale of 3.25 million shares for total proceeds of $105.6 million. The terms of the Secondary Public Offering, however, imposed a new 90–day "lock-up" according to which Splash insiders agreed not to sell any additional shares of their Splash stock into the open market until after November 19, 1997, without the written permission of the underwriters. (SAC ¶ 22) A flurry of trading activity followed prior to and just after November 19, 1997. Beheshti sold 8,500 shares for $264,775 on November 17, 1997, and another 5,000 shares for $173,750 on November 21, 1997.[1] Kleffman sold 20,000 shares for $655,800 between November 19 and 20, 1997. Platt disposed of 12,500 shares for $417,250 on November 24, 1997. (SAC ¶ 23)

After the close of the market on December 11, 1997, less than one month after the late-November sales described above, Splash's primary competitor, EFI, announced a revenue and earnings shortfall which it attributed to aggressive reductions of inventory by its customers (including Xerox and Fuji Xerox), delays in purchases associated with product transitions and weaknesses in the Asian economies. In the aftermath of these disclosures, EFI's stock plunged 60% and the price of Splash's stock fell in sympathy by as much as 21%. When Splash responded to the decline by stating that it "remain[ed] comfortable" with previous forecasts, however, its stock rebounded. (SAC ¶¶ 24–26) A subsequent report by Piper stated that Splash's business was growing aggressively, that sales had been strong across Splash's entire product line, and that Fuji Xerox was experiencing strong demand in Asia. (SAC ¶ 129) Plaintiffs allege defendants knew at the time that demand for Splash's products had peaked, that Splash's growth rate had declined, and would further decline, and that it was not insulated from the market conditions which EFI reported. (SAC ¶ 130)

On January 13, 1998, Splash disclosed that it expected slower growth in 1998 than it had seen in 1997.[2] In the wake of this announcement, the price of Splash's stock fell by 43%. (SAC ¶¶ 27–29) Between January 13, 1998 and October 1998, however, Splash allegedly made new false and misleading statements. Despite allegedly knowing that there was little demand for Splash products from Fuji Xerox due to economic conditions in Japan and that Splash was losing market share in the

---

**1.** The Second Amended Complaint alleges that Beheshti sold her stock on November 17 and November 1, 1997. (SAC ¶ 23) The second date appears to be a typographical error, however, because (1) the Second Amended Complaint suggests that the November 1, 1997 sale occurred *after* the November 17, 1997 sale (SAC ¶ 23), and (2) the First Amended Complaint ("FAC") listed the date of the second sale as November 21, 1997 (FAC ¶ 13). For these reasons, the Court construes paragraph 23 of the Second Amended Complaint as alleging that Beheshti sold her stock on November 17 and 21, 1997.

**2.** Plaintiffs allege that even this negative news was false and misleading since defendants knew by October 1997 that Fuji Xerox had forecast no growth for 1998. (SAC ¶ 122(b))

Xerox distribution channel to a new product line of its competitor, EFI, defendants allegedly continued to send positive messages to the public. (SAC ¶¶ 30, 32) Allegedly on the shoulders of defendants' statements, Splash's stock rose from $12 per share on January 15, 1998, to over $25 per share by July 23, 1998. (SAC ¶ 31)

After the market closed on October 13, 1998, Splash made a "stunning" revelation that caused its stock to plunge. Macgillivray stated, "Primarily as a result of the continuing uncertainties in the Pacific Rim, Japan in particular, we currently expect the 1998 December quarter operating results to be less than those of our 1997 December quarter." (SAC ¶ 33) Allegedly in response to this statement, on October 14, 1998, the price of Splash stock dropped by more than 46%. (SAC ¶ 34)

### B. *Procedural Background*

On January 9, 1999, plaintiffs Scott and Wu filed an action for securities fraud against Splash, Macgillivray, Platt, Kleffman, Beheshti, Berger, and Radius. Plaintiff Libros filed an identical action on January 28, 1999. This Court's May 3, 1999 order consolidated both actions.

Pursuant to an August 26, 1999 stipulation, plaintiffs sought leave to amend in the face of motions to dismiss filed by defendants to the original complaint. In the stipulated order granting leave to amend, plaintiff's "explicitly acknowledge[d] [that] defendant may move to dismiss the amended Complaint with prejudice on the grounds that [plaintiffs] already have received an opportunity to amend their Complaint." At least one of the factors motivating plaintiffs' request to file an amended complaint was the Ninth Circuit's decision in *In re Silicon Graphics, Inc. Sec. Litig.* ("*SGI*"), 183 F.3d 970 (9th Cir.1999), which, in plaintiffs' words, "create[d] a brand new definition of scienter and standard for pleading it." (Pl.'s August 10, 1999 Reply in Support of Motion for Continuance at p. 2) Plaintiffs filed their First Amended Complaint, a ninety-six page document, on January 19, 2000.

The Splash defendants and Kleffman and Beheshti subsequently moved to dismiss the First Amended Complaint. The Court's September 29, 2000 Order granted this motion in part, denied it in part, and ruled: (1) that certain specific statements were not actionable and should not be included in any Second Amended Complaint: (a) because the statutory safe harbor applied to them, (b) because they constituted vague assessments of past results, or (c) because they constituted historical facts and plaintiffs failed to allege facts that particularly challenged their accuracy. With respect to the remaining statements, the Court noted that dismissal with prejudice was "a viable option", but it declined to adopt such an approach at that juncture. *In re Splash Technology Holdings, Inc. Sec. Litig.* (hereinafter "*Splash*"), 2000 WL 1727377, *26 (N.D.Cal.). Instead, it provided the plaintiffs with specific instructions for pleading "falsity" to guide them in crafting any subsequent amendment to their complaint. The Court also instructed plaintiffs that, in attempting to meet the scienter pleading requirements, they should "specify the sources of defendants' alleged internal knowledge" with respect to "all statements for which leave to amend [was] extended". *Splash*, 2000 WL 1727377, *26. Finally, the Court dismissed the FAC with prejudice (1) to the extent that it attempted to premise liability on defendants' adoption or endorsement of analyst statements, and (2) to the extent that it presented claims for relief against individual defendants Kleffman and Beheshti. The Court granted plaintiffs leave to file a Second Amended Complaint consistent with its instructions, provided that they did so by October 25, 2000.

On October 25, 2000, plaintiffs filed their 124–page Second Amended Complaint (also referred to herein as "SAC"). The Splash defendants now move to dismiss the SAC. They claim: (1) that the Reform Act's safe harbor and the Bespeaks Caution Doctrine bar liability for the remaining forward-looking statements; (2) that the SAC fails to plead new facts which reliably show that Splash made false statements; (3) that the SAC fails to plead additional facts giving rise to a strong inference of scienter; and (4) that the SAC still does not allege an adequate basis for holding them liable for third party statements. The Splash defendants seek dismissal with prejudice. Plaintiffs oppose dismissal.

## II. *STANDARD OF REVIEW*

### A. *Motion to Dismiss Generally*

Under Federal Rule of Civil Procedure 12(b)(6), a motion to dismiss should not be granted unless it appears beyond a doubt that the plaintiff "can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). For purposes of such a motion, the complaint is construed in a light most favorable to the plaintiff and all properly pleaded factual allegations are taken as true. *Jenkins v. McKeithen*, 395 U.S. 411, 421, 89 S.Ct. 1843, 23 L.Ed.2d 404 (1969); *Everest and Jennings, Inc. v. American Motorists Ins. Co.*, 23 F.3d 226, 228 (9th Cir.1994). All reasonable inferences are to be drawn in favor of the plaintiff. *Jacobson v. Hughes Aircraft*, 105 F.3d 1288, 1296 (9th Cir.1997). When the complaint is dismissed for failure to state a claim, "leave to amend should be granted unless the court determines that the allegation of other facts consistent with the challenged pleading could not possibly cure the deficiency." *Schreiber Distrib. Co. v. Serv–Well Furniture Co.*, 806 F.2d 1393, 1401 (9th Cir.1986). Leave to amend is properly denied "where the amendment would be futile." *DeSoto v. Yellow Freight Sys.*, 957 F.2d 655, 658 (9th Cir.1992).

### B. *Pleading Requirements in Securities Fraud Actions*

Plaintiffs bring this action for allegedly false and misleading statements made in violation of § 10(b) of the Securities Exchange Act of 1934 ("the 1934 Act") and SEC Rule 10(b)(5). Section 10(b) of the 1934 Act prohibits the use of "manipulative or deceptive" activities in connection with the purchase or sale of securities. 15 U.S.C. § 78j(b). Rule 10(b)(5), which specifies what practices are manipulative or deceptive, provides that it shall be unlawful:

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b–5. A successful showing of a Rule 10b–5 violation requires four elements: (1) a misrepresentation or omission of a material fact, (2) reliance, (3) scienter, and (4) resulting damages. *Paracor Finance, Inc. v. General Electric Capital*, 96 F.3d 1151, 1157 (9th Cir.1996) (en banc).

In order to state claims for securities fraud under Section 10(b) of the 1934 Act and Rule 10b–5, a complaint must meet three pleading barriers. First, it must meet the general requirement established by Federal Rule of Procedure 8(a) that

complaints give a short and plain statement of the claim. Second, it must conform with the particularity obligations imposed by Rule 9(b). *In re GlenFed, Inc. Securities Litigation,* 42 F.3d 1541, 1545 (9th Cir.1994). Federal Rule of Civil Procedure 9(b) provides that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind may be averred generally."

The Private Securities Litigation Reform Act ("PSLRA") poses the third pleading hurdle. The PSLRA reiterates the particularity obligations of 9(b). First, the complaint must specify "each statement alleged to have been misleading." 15 U.S.C. § 78u–4(b)(1). Second, it also must specify the reason or reasons why the statement was false or misleading. *Id.* If an allegation regarding a misleading statement is made on information or belief, the complaint must state with particularity all facts forming the basis for the belief. *Id; In re Silicon Graphics, Inc. Securities Litigation ("Silicon"),* 970 F.Supp. 746, 763 (N.D.Cal.1997).

■ The third element of the PSLRA moves beyond 9(b)'s requirements. When pleading scienter, the PSLRA requires the complaint to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Id.* at (b)(2). In this circuit, this heightened scienter pleading standard "requires plaintiffs to plead, at a minimum, particular facts giving rise to a strong inference of deliberate or conscious recklessness"—a degree of recklessness strongly suggesting actual intent. *SGI,* 183 F.3d at 979 (emphasis added). A complaint merely alleging that a defendant had the motive and opportunity to commit fraud is insufficient. *Id.*

## III. DISCUSSION

In light of the PSLRA, two basic inquiries now arise when courts consider a motion to dismiss a securities fraud claim. The first issue is whether the complaint alleges a manipulative or deceptive practice with sufficient particularity. *See, Schaffer v. Evolving Systems, Inc.,* 29 F.Supp.2d 1213, 1220 (D.Col.1998). The second issue is whether the complaint states with particularity allegations giving rise to a strong inference of deliberate or conscious recklessness. *See id.* The Splash defendants have challenged plaintiffs' Second Amended Complaint on both grounds.

### A. *False or Misleading Statements*

### 1. *Safe Harbor* [3]

■ The PSLRA carved out a safe harbor from liability for certain forward-looking statements. A forward-looking statement is defined as a statement containing a projection of revenues, income, or earnings per share, management's plans or objectives for future operations, and a prediction of future economic performance. 15 U.S.C. § 78u–5(i)(1)(A)–(C). In addition, any statement of "the assumptions underlying or relating to" these sorts of statements fall within the meaning of a forward-looking statement. 15 U.S.C. § 78u–5(i)(1)(D). A present-tense statement can qualify as a forward-looking statement as long as the truth or falsity of the statement cannot be discerned until some point in time after the statement is made. *See, Harris v. Ivax Corporation,* 182 F.3d 799, 805 (11th Cir.1999), *reh'g denied,* 209 F.3d 1275 (11th Cir.2000) (clas-

---

**3.** The analysis in this section and in Sections III, A, 2, b & c apply to *all* defendants (not just the Splash defendants) because defendants Radius and Berger incorporate by reference the arguments of the Splash defendants discussed therein. Thus, these sections use the term "defendants" rather than "Splash defendants".

sifying the statement "the challenges unique to this period in our history are now behind us" as a forward-looking statement). Statements concerning historical or current facts are not forward-looking. *See Gross v. Medaphis Corp.*, 977 F.Supp. 1463, 1473 (N.D.Ga.1997); *In re ValuJet, Inc. Sec. Litig.*, 984 F.Supp. 1472, 1479 (N.D.Ga.1997). Whether a statement qualifies for the safe harbor is an appropriate inquiry on a motion to dismiss. 15 U.S.C. § 78u–5(e).

The purpose behind this safe harbor is to encourage the disclosure of forward-looking information. H.R. Conf. Rep. No. 104–369, 104th Cong. 1st Sess., at 53 (1995). Accordingly, pursuant to 15 U.S.C. § 78u–5(c)(1), a forward-looking statement cannot as a matter of law be the basis for liability under section 10(b) if

(A) the forward-looking statement is—

**(i) identified as a forward-looking statement, and is accompanied by meaningful cautionary statements** identifying important factors that could cause actual results to differ materially from those in the forward looking statement; *or* . . .

(B) the plaintiff fails to prove that the forward-looking statement—

(i) if made by a natural person, was made with **actual knowledge that the statement was false or misleading;** or

(ii) if made by a business entity, was—
. . . made or approved by [an executive officer] with actual knowledge by that officer that the statement was false or misleading.

15 U.S.C. § 78u–5(c)(1) (emphasis added). "Thus, the statute provides that a forward-looking statement cannot be the basis for [section] 10b liability if either the forward-looking statement is accompanied by *meaningful cautionary language, or* the plaintiff fails to prove that the person making the statement made it with *actual knowledge* that the statement was false and misleading." *In re Boeing Securities Litigation*, 40 F.Supp.2d 1160, 1167 (W.D.Wash.1998). *Accord, Harris*, 182 F.3d at 803; *Kensington Capital Management v. Oakley, Inc.*, 1999 WL 816964, *3 (C.D.Cal.1999).

■ In its September 29, 2000 Order, the Court found that the first prong of the statutory safe harbor applied to a number of written forward-looking statements in this case, and it dismissed the First Amended Complaint with prejudice insofar as it relied on allegations concerning those statements.[4] The Court also dismissed the First Amended Complaint to the extent that it relied on alleged oral statements, even though those statements were not accompanied by cautionary statements, based on the second prong of the statutory

---

4. In their opposition to the Splash defendants' current motion to dismiss, plaintiffs submit that this ruling was in error and they ask the Court to reconsider and permit them to reinstate these allegations. (Pl.'s Opp. at pages 23–26) Plaintiffs' request hereby is DENIED for the following reasons. First, plaintiffs never requested and, therefore, did not obtain, leave to move for reconsideration. *See,* Civil L.R. 7–9(a) (no party may move for reconsideration without first obtaining leave of the Court to do so). Second, even assuming that plaintiffs' request in its opposition to the motion to dismiss could be construed as a request for leave to move for reconsideration, it would be denied because plaintiffs do not satisfy, or even address, the standard required to obtain such leave. *See,* Civil L.R. 7–9(b). Finally, plaintiffs' request would be denied in any case because the Court does not agree

that its ruling was in error. Plaintiff takes issue with the Court's conclusion that "[s]ubsections (A) and (B) of 15 U.S.C. § 78u–5(c)(1) provide alternative means by which forward-looking statements may qualify for the safe harbor . . ." *Splash,* 2000 WL 1727377, *8, n. 6. This conclusion is required by the plain language of the statute, however, "as evidenced by the word 'or' at the end of 15 U.S.C. § 78u–5(c)(1)(A)(ii)." *Id.See, SGI,* 183 F.3d at 983–84 (confirming that Courts "need inquire no further" where the language of the statute is clear). Moreover, the legislative history confirms that the two prongs of the safe harbor were intended as alternative bases for protection. *See,* H.R. Conf. Rep. No. 104–369, at page 40, 1995 WL 709276 (Leg.Hist.) ("The first prong of the safe harbor requires courts to examine only the cau-

safe harbor, because plaintiffs did not plead the circumstances and falsity of those statements with sufficient particularity. The Court granted leave to amend with respect to the latter set of allegations, but instructed plaintiffs that any Second Amended Complaint should allege (1) the falsity of each statement in sufficient detail, and (2) specify the sources of defendants' alleged internal knowledge.

Defendants now seek dismissal of the Second Amended Complaint with respect to all remaining forward-looking statements based upon the second prong of the statutory safe harbor. They contend that plaintiffs have not complied with the Court's September 29, 2000 Order by alleging particularized facts showing that defendants had actual knowledge that any forward-looking statements were false or misleading—"the substantive standard they must meet to blow the statements out of the safe harbor." *In re CIENA Corp. Securities Litigation*, 99 F.Supp.2d 650, 661–62 (D.Md.2000) (citing 15 U.S.C. § 78u–5(c)(1)(B)).

■ Under the PSLRA, plaintiffs must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2). "The required state of mind is based on the type of statement allegedly made by the defendant." *Hock-*

*ey v. Medhekar*, 30 F.Supp.2d 1209, 1221 (N.D.Cal.1998) (citing 15 U.S.C. § 78u–5(c)(1)(B)). "Where a plaintiff alleges false forward-looking statements, the 'required state of mind' is 'actual knowledge' that the statement was false at the time it was made." *Pegasus Holdings v. Veterinary Centers of America, Inc.*, 38 F.Supp.2d 1158, 1161 (C.D.Cal.1998) (citing *Molinari v. Symantec Corp.*, 1998 WL 78120, *3 (N.D.Cal.)). To the extent that they rely upon allegations of false forward-looking statements, therefore, plaintiffs must plead, "in great detail", "all the facts" forming the basis for their belief that defendants made the forward-looking statements with actual knowledge that they were false. *SGI*, 183 F.3d at 983–84 (reading the PSLRA's command "that a plaintiff plead all the 'facts' with 'particularity' to mean that a plaintiff must provide a list of all relevant circumstances in great detail"). If plaintiffs do not meet this standard, the Court is obligated to dismiss their complaint. *Pegasus Holdings*, 38 F.Supp.2d at 1161.

Plaintiffs contend that they have satisfied this pleading requirement by alleging that "inconsistent contemporaneous information ... was available to defendants".[5] (Pls.' Opp. to Splash Mot. at 19:8–13) In support of this argument, plaintiffs cite to conclusory allegations in their Second

---

tionary statement accompanying the forward-looking statements. Courts should not examine the state of mind of the person making the statement"; "The second prong of the safe harbor provides an alternate analysis"); *id.* at page 43 ("The applicability of the safe harbor provisions under subsection (c)(1)(B) shall be based on the 'actual knowledge of the defendant and does not depend on the use of cautionary language. The applicability of the safe harbor provisions under subsections (c)(1)(A)(I) and (c)(2) shall be based upon the sufficiency of the cautionary language under those provisions and does not depend on the state of mind of the defendant"). *See also, SGI*, 183 F.3d at 977 (looking "first ... to the

conference report" in interpreting legislative history "because, apart from the statute itself, it is the most reliable evidence of congressional intent").

5. Plaintiffs also claim to have satisfied the pleading requirement for "actual knowledge" with allegations that "specific contemporaneous conditions ... undermined defendants' optimistic claims". (Pl.'s Opp. at 19:8–13) In so contending, plaintiffs blend their arguments concerning falsity and actual knowledge. *See, Splash*, 2000 WL 1727377, *13 (stating that this type of allegation will explain why a statement is false). Obviously, allegations concerning "contemporaneous

Amended Complaint that defendants were "hands on" managers, that they closely monitored the businesses of their key customers, Xerox and Fuji Xerox, and that they knew about the adverse information from internal reports and conversations with other unidentified officers and employees of Splash. *See,* SAC ¶¶ 46, 48–49, 52. Plaintiffs also point to allegations that "Fuji Xerox" gave "Splash" forecasts concerning its projected demand. *See,* SAC ¶ 50. Finally, the SAC refers to certain analyst reports about EFI and Xerox, a third-party forecast about the Japanese economy, Xerox press releases about the rate at which its revenues were growing, and an EFI Press release concerning new products, and alleges in a conclusory fashion that defendants were aware of the statements contained therein. SAC ¶¶ 89, 91, 102, 110, 123, 150, 161.

Plaintiffs' allegations do not give rise to a strong inference that the forward-looking statements in issue were made with actual knowledge of their falsity. First, plaintiffs admittedly make these allegations on information and belief. *See,* Pls.' Opp. to Splash Mot. at 19:11. When an allegation regarding a misleading statement is made on information or belief, the complaint must state with particularity all facts forming the basis for the belief. 15 U.S.C. § 78u–4(b)(1); *Silicon,* 970 F.Supp. at 763. Failure to allege the sources of plaintiffs' information is not adequate.[6] *SGI,* 183 F.3d at 985. Nor is it adequate to allege that defendants had access to certain internal reports (whether oral or written), without identifying the documents or com-

munications, their contents, the people who made or prepared them, or which officers received or reviewed them. *Id.; Heliotrope Gen., Inc. v. Ford Motor Co.,* 189 F.3d 971, 979 (9th Cir.1999); *In re Dura Pharmaceuticals, Inc.,* 2000 WL 33176043, *8 (S.D.Cal.) ("Plaintiffs need to cite where they got their information, and how each of the Defendants knew about this information").

Plaintiffs' allegations concerning defendants' management style and level of contact with company customers admittedly are based upon information provided by confidential informants. No information is pled concerning the informants' bases of knowledge. (SAC ¶ 49) Allegations concerning defendants' access to, and awareness of, adverse information through internal reports and oral communications within Splash are not supported by any specific facts concerning the people who made or received the reports, the content of the reports, the dates of transmissions, the manner in which they were transmitted or the bases for plaintiffs' knowledge. *See e.g.,* SAC ¶ 52. While the SAC does allege that Fuji Xerox and Xerox provided Splash with certain reports and/or forecasts, it does not plead specific facts concerning the identity of the recipients, the manner in which the reports were provided, the dates on which they were transmitted, or the content of those reports. Finally, while the SAC does list in detail certain contemporaneous reports and forecasts issued by third parties, it alleges no specific facts to suggest that the defendants received, reviewed or even were

---

conditions" without more will not demonstrate actual knowledge on the part of defendants that their inconsistent statements were false or misleading absent allegations presenting specific facts giving rise to a strong inference that defendants were aware of the contemporaneous conditions and knew their import at the time they made those statements.

**6.** *See,* Splash, 2000 WL 1727377, *26 ("plaintiffs in any effort to meet the scienter pleading requirements *shall* specify the sources of defendants' alleged internal knowledge" in any Second Amended Complaint) (emphasis added).

aware of these reports. *See,* SAC ¶¶ 90, 101, 109, 122, 149, 151, 160. Given these significant gaps, the Court finds that plaintiffs' have failed to plead in "great detail" specific facts sufficient to demonstrate a strong inference that defendants made the forward-looking statements here in issue with actual knowledge that they were false.

Plaintiffs nevertheless attempt to avoid dismissal by arguing (1) that statements contained in defendants' written press releases did not constitute forward-looking statements, and (2) that others of defendants' allegedly false and misleading statements (both written and oral), while admittedly forward-looking, did not satisfy the requirements for protection from liability under the first prong of the safe harbor provisions. These arguments are unavailing for the following reasons.

First, as defendants correctly point out, the Second Amended Complaint does not allege that any of the statements contained in defendants' written press releases were actionable statements, *i.e* ., false and misleading. *Compare,* SAC ¶¶ 80, 94, 96, 104,

106, 114, 128, 131, 132, 146, 152, 162 (allegations regarding press releases), *with,* SAC ¶¶ 90, 101, 109, 122, 149, 160 (allegedly actionable statements). Consequently, the Court need not (and does) not decide whether those statements properly qualify as forward-looking.

Second, as noted above, the Court already has ruled, that the two prongs of the safe harbor are "alternative means by which forward-looking statements may qualify for the safe harbor ..." *Splash,* 2000 WL 1727377, *8, n. 6. For the reasons stated *supra,* the Court concludes that the remaining forward-looking statements contained in the SAC are protected by the second prong of the safe harbor because plaintiffs have not pled facts with sufficient particularity to give rise to a strong inference that defendants made these statements with actual knowledge of their falsity.[7] Plaintiffs' argument that the statements do not qualify for protection under the first prong of the safe harbor, therefore, is irrelevant.[8]

Accordingly, defendants' motions to dismiss the Second Amended Complaint inso-

---

7. In their moving papers, the Splash defendants identify the following paragraphs as containing forward-looking statements: SAC ¶¶ 81, 83, 87, 92, 95, 97–100, 105, 107–108, 113, 115, 117, 119, 129, 133, 141, 143, 151, 153, 156–159. *See,* Defs.' Motion at p. 5, n. 4. Each of these paragraphs contain multiple alleged statements. The Splash defendants do not clarify whether they are contending that each and every alleged statement contained therein, or only some subset, should be considered forward-looking. Plaintiffs respond by attaching a chart to their opposition brief in which they list each individual statement contained in the Second Amended Complaint and state their position as to whether each is or is not forward-looking. *See,* Pls.' Opp. to Splash Mot., Ex.2. Defendants do not take issue with plaintiffs' itemization in their reply brief. The Court interprets this as a concession that plaintiffs' characterization is correct. The Court notes, however, that plaintiffs' chart does not address the state-

ments contained in paragraph 99 of their SAC. Defendants contend that those statements should be considered forward-looking. *See,* Defs.' Motion at p. 5, n. 4. The Court interprets plaintiffs' failure to dispute this characterization as a concession. Accordingly, the Court finds it undisputed that the following alleged statements are forward-looking: (1) those identified as such at Pls.' Opp. to Splash Mot., Ex. 2, and (2) those referenced at SAC ¶ 99. The Court's order dismissing all forward-looking statements applies to these statements.

8. In its September 29, 2000 Order, the Court noted that "[a] statement cannot fall within the safe harbor if it is not specifically identified as forward-looking." *Splash,* 2000 WL 1727377, *7. The Court made this statement in the context of its analysis under the first prong of the safe harbor, which does contain such a requirement. The second prong of the safe harbor, in contrast, contains no such requirement. As noted above, the Court con-

far as it relies upon forward-looking statements hereby are GRANTED. In its September 29, 2000 Order, the Court dismissed allegations concerning certain statements with prejudice and noted that "dismissal with prejudice [was] a viable option for plaintiffs' other statements". *Splash*, 2000 WL 1727377, *26. Nevertheless, the Court granted plaintiffs a further opportunity to amend their Complaint to allege in sufficient detail, if they could, the specific facts underlying their claims in this action. Given plaintiffs' current failure, the Court concludes that further amendment would be futile. Accordingly, the allegations concerning the remaining forward-looking statements hereby are dismissed with prejudice.[9]

### 2. *False or Misleading*

■ Similar to Rule 9(b), the PSLRA requires the complaint first to specify each misleading statement and then to specify the reason(s) why the statement was misleading. 18 U.S.C. § 78u–4(b)(1). In Rule 9(b) terms, the complaint must specify both the circumstances of the statement, including its time, place, and content, and the circumstances indicating the falseness of the statement when it was made. *See, GlenFed*, 42 F.3d at 1547–48. When alleging that particular statements were *false* or *misleading*, the complaint must make "specific references to specific facts" as the

basis for the falsity allegation. *Wenger v. Lumisys, Inc.*, 2 F.Supp.2d 1231, 1251 (N.D.Cal.1998). Moreover, the complaint must allege that the "true facts" arose *prior* to the allegedly misleading statement. *Id.* at 1250. This requirement helps guard against pleading fraud by hindsight, *see, SGI*, 183 F.3d at 988, and helps prevent providing a complaint passageway through the pleading stage merely because it alleges that the allegedly fraudulent statements conflict with the current state of facts. *GlenFed*, 42 F.3d at 1548. *See generally, Ronconi v. Larkin*, 1998 WL 230987 (N.D.Cal.) (J. Legge) (" '[P]laintiffs must set forth facts explaining why the difference between the earlier and the late statements is not merely the difference between two permissible judgments, but rather the result of a falsehood' ") (citing *GlenFed*, 42 F.3d at 1549).

In this case, the Splash defendants do not contend that the Second Amended Complaint fails to plead the who, what, when, and where of the allegedly fraudulent statements. Rather, they fault it for failing to plead with requisite particularity the **falsity** of these statements. The Splash defendants group their attack into the following categories: (1) the "puzzle style" of the pleading, (2) channel stuffing allegations, (3) general statements of optimism, (4) statements of historical facts, and (5) duty to update.[10]

cluded elsewhere in its September 29, 2000 Order that the two prongs of the safe harbor "provide *alternative* means by which forward-looking statements may qualify" for protection. *Splash*, 2000 WL 1727377, *8 n. 6. The Court declines plaintiffs' invitation to reconsider that conclusion. *See supra*.

9. Because it has concluded that defendants' forward-looking statements qualify for protection under the safe harbor, the Court need not (and does not) address defendants' arguments, in the alternative, (1) that the same statements also qualify for protection under the bespeaks caution doctrine, and/or (2) that

plaintiffs have failed to plead adequate facts showing the forecasts were false.

10. The Splash defendants also contend that plaintiffs failed (1) to properly plead the falsity of Splash's forecasts, or (2) to meet the standard for pleading falsity on information and belief. Because any forecasts must, by their nature, qualify as forward-looking statements, they are protected by the second prong of the safe harbor, *see, supra,* and therefore not actionable. The Court also need not determine whether plaintiffs have met the standard for pleading falsity on information and belief, given its finding, *infra,* that plaintiffs

### a. *Puzzle Style Pleading*

█ Rule 8(a) provides that any pleading "which sets forth a claim for relief", such as a complaint, "shall contain", *inter alia*, " a short and plain statement of the claim showing that the pleader is entitled to relief". Fed.R.Civ.P. 8(a). Each averment contained therein "shall be simple, concise, and direct." Fed.R.Civ.P. 8(e). In order to state a claim for securities fraud, a complaint also must specify "each statement alleged to have been misleading, [and] the reason or reason why the statement is misleading". 15 U.S.C. § 78u–4(b)(1). The Splash defendants contend that the Second Amended Complaint does not comply with these requirements. The Court agrees.

The SAC tips the scales at 124 pages. Seventy-six of those pages and 89 of the 184 paragraphs contained therein are devoted to a section entitled "False and Misleading Statements During the Class Period". (SAC at 44:14–15) In that section, plaintiffs separate the class period into six general time periods during which they claim defendants made material misrepresentations, and within each of those periods, describe various occasions on which they claim false statements were made, or refer to various documents which they contend contain false statements. *See*, SAC ¶¶ 80–167. Following each of the six groups of allegations of false statements, plaintiffs identify generally those *types* of statements, from the preceding recitation of specific alleged statements, which they contend were false and misleading (without identifying specific paragraph(s) which contain those statements) and, then, provide a list of between five and nineteen "reasons" that the statements were false at the time they were made (again, without identifying which alleged false statement(s) are belied by the facts stated in

have not satisfied the standard for pleading

each "reason"). *See*, SAC ¶¶ 90, 101, 109, 122, 149, and 160.

The structure of the Second Amended Complaint renders it exceedingly difficult to discern precisely which statements are alleged to be misleading. Plaintiffs take two approaches to identifying the allegedly misleading statements. In the first approach, when referring to conference calls and discussions occurring after them, plaintiffs simply provide a long list of statements allegedly made by both of the individual Splash defendants (Macgillivray and Platt). For example, in paragraph 105 (the July 15, 1997 conference call and follow up conversations on the same day and the next day), plaintiffs list eight alleged statements, most containing more than a single assertion, some overlapping with other statements in the list. The Second Amended Complaint does not specify which of the individual Splash defendants allegedly made each statement. Nor does it state the specific date, time or circumstances of each alleged statement.

One of the statements set forth in paragraph 105 reads as follows: "The Company's growth strategy was unfolding as planned—the Company was entering into new and ancillary markets, and broadening its product line. Growth would continue to be fueled by the broadening of the market to further penetrate beyond the graphic professionals, servers, leverage existing OEM." SAC ¶ 105 (bold in original). In order to confirm whether part or all of this statement is alleged to be false (and if only part, which part), the reader must turn to paragraph 109 and wade through the catalogue of statements, or fragments of statements, lifted from the preceding four paragraphs (each of which spans an entire page). In this case, it appears that plaintiffs take issue only with the first portion of the first sentence of the statement,

scienter.

namely, the claim that the Company's growth strategy was "unfolding as planned". To find out the basis for plaintiffs' belief that the statement was false and misleading when made, the reader then must sift through subsections (a) through (j) of paragraph 109 (which span two more pages). This task is made all the more difficult because none of the ten subsections in paragraph 109 specifically confirms that it is the basis for plaintiffs' claim that the alleged statement ("The Company's growth strategy was unfolding as planned") was false or misleading. Given this omission, it is not immediately clear which portion of paragraph 109 is intended to explain why the statement was false or misleading.

The second approach, used when referring to the written analysts' reports, or the press releases, is to quote long passages from various documents and to highlight portions of the quoted passages. In paragraph 141, for example, plaintiffs quote eight block sections of one report, and highlight twelve parts of those eight sections. In paragraph 143, they quote six block sections of another report, and highlight five parts of those six sections. In paragraphs 139–140, and 144–148, plaintiffs list still other alleged statements from analyst reports and press releases during the same time period. The reader then must (1) turn to paragraph 149, which

summarizes by listing eleven allegedly false and misleading statements, or types of statements, from the preceding nine paragraphs (SAC ¶¶ 139–48), and (2) attempt to determine, by paging back and forth among the respective paragraphs, which statements (or portions thereof) are alleged to be false and misleading. The fact that certain sections of the report have been highlighted is not a reliable guide to determining which statements are alleged to be false, as bolded statements sometimes do not turn out to be actionable, while non-bolded statements sometimes are actionable. Having determined which of the statements allegedly are false and misleading (no small task in itself), the reader then must scan subsections (a) through (m) of paragraph 149 to select those which contain the basis for the claims that the statements are false and misleading.[11]

"In short, plaintiffs have left it up to defendants and the court to try to figure out exactly what the misleading statements are, and to match the statements up with the reasons they are false or misleading." *In re Autodesk, Inc. Sec. Litig.*, 132 F.Supp.2d 833, 841 (N.D.Cal.2000). "The predictable demands of reviewing such a complaint abuse judicial resources. 'When attorneys admitted to practice in Federal courts prepare complaints, neither the Court nor opposing counsel should be re-

---

11. As an illustration of the difficulty involved in deciphering the Second Amended Complaint, the Court notes the argument of the Splash defendants that plaintiffs have added to their SAC allegations concerning new actionable statements in violation of the Court's order that it not do so. *See, Splash,* 2000 WL 1727377, \*27 ("Plaintiff has not requested leave to *add* any new statements to any amended complaint. Therefore, any amended complaint shall *not* include any new actionable statements"). The Splash defendants point in particular to allegations contained in paragraphs 81, 83, 86, 92, 95, 98, 100, 105–08, 153 and 157 of the SAC. In order to

determine whether those paragraphs contain new allegations of actionable statements, the Court would be required to review each of the alleged statements contained in each of these paragraph, scan the 96–page FAC to determine whether the same facts are alleged there, and then review with care the paragraphs in the SAC and the FAC listing the alleged actionable statements. To accomplish this task with confidence, a reader easily might spend several hours. Because the Court concludes for other reasons that the Second Amended Complaint should be dismissed with prejudice, it need not (and does not) resolve this issue.

quired to expend time and effort searching through large masses of conclusory, argumentative, evidentiary and other extraneous allegations in order to discover whether the essentials of claims asserted can be found in such a melange.'" *Wenger*, 2 F.Supp.2d at 1243–44 (quoting *Silver v. Queen's Hospital*, 53 F.R.D. 223, 226 (D.Haw.1971)). "'It is the duty and responsibility, especially of experienced counsel, to state those essentials in short, plain, and non-redundant allegations.'" *Id.* at 1244 (quoting *Silver*, 53 F.R.D. at 226).

"In the context of securities class action complaints, courts have repeatedly lamented plaintiffs' counsels' tendency to place 'the burden [ ] on the reader to sort out the statements and match them with the corresponding adverse facts to solve the "puzzle" of interpreting Plaintiffs' claims.'" *Id.* (quoting *In re Oak Tech. Sec. Litig.*, 1997 WL 448168, *5 (N.D.Cal.)), and citing, *inter alia: In re GlenFed. Inc. Sec. Litig.*, 42 F.3d at 1544 (These "puzzle-style" complaints are an "unwelcome and wholly unnecessary strain on defendants and the court system"); *May v. Borick*, 1997 WL 314166, *8 (C.D.Cal.) ("[The complaint's] organization obfuscates rather than clarifies. Plaintiff's failure to address defendants' allegedly misleading statements individually, or even by category, and to state why each statement, or category of statements is misleading, renders this Court's task, and the task of the defendants excessively difficult"); *Shuster v. Symmetricom, Inc.*, 1997 WL 820967, *1 (N.D.Cal.) ("The Complaint as it now stands is a rambling set of allegations which is almost impossible to effectively review ... Plaintiff sets forth lengthy quotes from various releases by defendants' officers and a securities analyst but does not make clear what portion of each quote constitutes a false presentation"); *Kane v. Madge Networks, N.V.*, 96–20652 RMW (N.D.Cal.1997) ("This

maze-like style renders it almost impossible to determine the sufficiency of plaintiffs' explanations as to why the alleged statements were false or misleading when they were made"); *In re Conner Peripherals, Inc.*, 1996 WL 193811, *1 (N.D.Cal.) ("The complaint as written requires the court to excavate for actionable claims ... Judicial resources are too scarce and worthy cases too pressing for a case to spend its time rooting around in bloated complaints by experienced lawyers for a handful of actionable allegations").

The Court finds that plaintiffs have failed to set forth a "short and plain" statement of their claims in violation of Rule 8(a) and have failed to make each allegation "simple, concise and direct" in violation of Rule 8(e). Moreover in contravention of the PSLRA, plaintiffs have failed to craft a complaint in such a way that a reader can, without undue effort, divine precisely which statements (or portions of statements) are alleged to be false or misleading, and the reason or reasons why each statement is false or misleading. The Court therefore GRANTS the Splash defendants' motion to dismiss the SAC in its entirety. Given plaintiffs' failure in three successive attempts to satisfy the pleading requirements of Rule 8 and the PSLRA, and based upon other deficiencies set forth below, the Court finds that further amendment would be futile. Accordingly, the Second Amended Complaint hereby is dismissed with prejudice.

#### b. *Channel Stuffing*

■ The Second Amended Complaint alleges that, in order to make it appear that demand was stronger than it actually was, Splash deliberately shipped excessive quantities of its product to Fuji Xerox and Xerox between April and July of 1997, while assuring them that they could delay payment or return any unsold product at a

later time. (SAC ¶ 109(e)) Plaintiffs present this allegation on information and belief, based upon "an analysis of Splash's financial statements", which they contend show a "huge increase in Splash's day sales outstanding and [a] subsequent decline in Splash's quarterly revenue." (SAC ¶ 110(b)) This is essentially an allegation of channel stuffing.

"Channel stuffing" is "the oversupply of distributors in one quarter to artificially inflate sales, which will then drop in the next quarter as the distributors no longer make orders, while they deplete their excess supply." *Steckman v. Hart Brewing, Inc.*, 143 F.3d 1293, 1298 (9th Cir.1998). "[T]his Circuit has rejected 'channel stuffing' claims." *In re Ashworth, Inc. Sec. Litig.*, 2000 WL 33176041, *7 (S.D.Cal.) (citing *Steckman*, 143 F.3d at 1298). *See, Dura Pharmaceuticals*, 2000 WL 33176043, *8 (same). In *Steckman*, the Ninth Circuit stated that such a "claim is speculation made in hindsight." *Steckman*, 143 F.3d at 1298. Plaintiffs plead no specific facts to support a contrary conclusion in this case. Their chart of quarterly revenues is equally susceptible of many different interpretations. *See, also, Greebel v. FTP Software, Inc.*, 194 F.3d 185, 202 (1st Cir.1999) (noting that "there is nothing inherently improper in pressing for sales to be made earlier than in the normal course"). The allegation of "channel stuffing", therefore, remains "conclusory, and the inference of false statements unavailing." *Splash*, 2000 WL 1727377, *16. Accordingly, defendants' motions to dismiss are GRANTED insofar as they relate to this allegation.

### c. *Puffery*

Defendants next challenge the inclusion in the SAC of optimistic statements that are merely "puffing statements." They particularly point to statements (1) about Splash's "strong" demand (SAC ¶¶ 81–83, 86, 92, 95, 98, 100, 105–08, 115, 119, 129, 141, 153, 157, 159); (2) that Splash's results were "better than expected" or "robust" (SAC ¶¶ 108, 119, 153, 156); (3) that Splash's growth strategy "was unfolding as planned" (SAC ¶¶ 81, 83, 95, 98, 100, 105, 108, 115, 119); (4) that it was "well positioned" (SAC ¶ 92); (5) that its position was "solid" (SAC ¶ 141); and (6) that characterize its product line as "improved" (SAC ¶ 160).

In considering whether general expressions of optimism were actionable in its September 29, 2000 Order, the Court adopted the approach set forth in *Hoxworth v. Blinder, Robinson & Co., Inc.*, 903 F.2d 186 (3d Cir.1990). *See, Splash*, 2000 WL 1727377, *16. *Hoxworth* emphasizes that the defining question is whether the statement is immaterial; that is whether the statement is so "exaggerated" or "vague" that no reasonable investor would rely on it when considering the total mix of available information. *Hoxworth*, 903 F.2d at 200. Hyperbolic statements assigning reasons for and placing adjectives on past results generally are not actionable since they "contain no implicit prediction that those events or conditions will continue in the future." *In re Caere Corporate Sec. Litig.*, 837 F.Supp. 1054, 1058 (N.D.Cal. 1993) (J. Williams). *See e.g., Wenger*, 2 F.Supp.2d at 1245–46 (finding "we were able to perform two successful acquisitions last year" and "1995 was a very good year for Lumisys" to constitute nonactionable vague statements); *In re Cypress Semiconductor Sec. Litig.*, 891 F.Supp. 1369, 1379 (N.D.Cal.1995) (finding that "[o]ur new Minnesota plant continues its excellent performance and already accounts for 6% of Cypress" revenues was not an actionable statement since it was an accurate factual account of past performance and did not convey a false or misleading impression of future success).

■ Based on these principles, the Court ruled in its prior order that statements which used the words "healthy", "strong", or "increased awareness" constituted vague assessments of past results, on which no reasonable investor would rely. *See, Splash,* 2000 WL 1727377, *17. The Court now reiterates this conclusion with respect to statements using the word "strong", and finds the words "robust", "well positioned", "solid" and "improved", as they are used in the SAC, to be similarly vague and nonactionable. The Court also finds that vague references to past results as being "better than expected", and/or conclusory statements that things were "unfolding as planned" constituted hyperbole, and did not convey a false or misleading impression of the future on which a reasonable investor would rely.

Accordingly, defendants' motion to dismiss the SAC insofar as it seeks to hold them liable for optimistic statements containing such language hereby are GRANTED. *See,* SAC ¶¶ 81–83, 86, 92, 95, 98, 100, 105–08, 115, 119, 129, 141, 153, 156, 157, 159, 160 (including allegations concerning such statements).

### d. *Historical Facts*

The Splash defendants contend that the SAC also seeks to hold them liable based on statements which are not alleged to be false or misleading. They cite to SAC ¶¶ 115–17, 129, 133, 141, 153, and 156–59. (Defs.' Motion at p. 16) Plaintiffs do not respond by pointing to any allegation that the referenced statements were false or misleading. (Pls.' Opp. to Splash Mot. at p. 18) The Court has reviewed the referenced paragraphs and compared them with the paragraphs presenting alleged actionable statements. *See,* SAC ¶¶ 122, 149, 160. Based upon this review, it concludes that the Splash defendants are correct.[12] Accordingly, the SAC is dismissed to the extent that it seeks to hold the Splash defendants liable for such statements.

### e. *Duty to Update*

■ The SAC alleges (1) that Splash claimed a competitive advantage in its February 4, 1997 Annual Report to Shareholders, and in subsequent discussions with an analyst (reflected in the analyst's February 28, 1997 report), based on the fact that its product used an "open systems" nonproprietary architecture (rather than a proprietary, closed solutions architecture), and (2) that these statements became "false and misleading" about a year later when Splash failed to correct these statements after one of its competitors, EFI, announced the introduction of a product that adopted the same type of system (*i.e.,* an "open systems" nonproprietary architecture). *See,* SAC ¶¶ 88, 89, 92, 93. The Court does not agree that the introduction of EFI's new product rendered the alleged statements false or misleading.

In arguing that Splash had a duty to update the statements, plaintiffs rely principally on the decision of the Second Circuit Court of Appeals in *In re Time Warner Inc. Securities Litig.* In that case, the defendants made certain statements hyping strategic alliances with foreign partners. The plaintiffs subsequently sought to hold the defendants liable for failing to

---

**12.** Specifically, the SAC does not allege that the statements presented in the following paragraphs were false or misleading: SAC ¶¶ 115 (bullets 2, 4), 117 (*1–8, middle of *9, bottom of *10), 129 (1st bullet, and last 3 sentences of 2d and 3d bullets), 133 (bullets 1, 3), 141 (bullets 1 and 4, 1st sentence of bullet 3), 153 (bullets 5, 7 and 8), 156 (first two and last two sentences of block 1, sentences 3 and 5 of block 2, all of block 3), 157 (blocks 1, 2, 4, 5; sentences 1, 2, and 4 of block 3; sentences 1–3 and 6 of block 6), 158, and 159 (blocks 1–4, 7, 9; sentences 1, 2, and 6 of block 5; sentences 3–5 of block 6; and sentences 1–3, and 5 of block 8).

disclose problems in the alliance negotiations as those problems developed. 9 F.3d 259, 266–67 (2d Cir.1993). Addressing this argument, the Second Circuit agreed generally "that a duty to update opinions and projections may arise if the original opinions or projections have become misleading as the result of intervening events." *Id.* at 267. In that case, however, the Second Circuit concluded that "the attributed public statements lack[ed] the sort of definite positive projections that might require later correction." *Id.*

The same is true in this case. Indeed, the statements at issue, with one exception, do not constitute projections at all, but rather statements of historical facts. In both the Annual Report and its alleged statements to the analyst, Splash credited its past successes *inter alia* on its "support of open systems" and the competitive advantage which this type of system bestowed. *See,* SAC ¶¶ 88, 92. "Statements regarding past events contain no implicit prediction that those events or conditions will continue in the future." *In re Caere Corp. Sec. Litig.,* 837 F.Supp. at 1058 (citing *In re Convergent Technologies Sec. Litig.,* 948 F.2d 507, 513 (9th Cir.1991)). *Accord, Wenger,* 2 F.Supp.2d at 1245 ("Disclosure of accurate historical data does not become misleading even if less favorable results might be predictable by the company in the future"). *See also, In re Stac Electronics Sec. Litig.,* 89 F.3d 1399, 1410 (9th Cir.), *cert. denied,* 520 U.S. 1103, 117 S.Ct. 1105, 137 L.Ed.2d 308 (1997) ("technical obsolescence of computer equipment in a field marked by rapid technological advances is information within the public domain"). The sole exception is the statement contained in the analyst's report suggesting that Splash would continue to have a competitive advantage over those companies that adopted a "closed systems" approach. (SAC ¶ 92) The fact that EFI subsequently adopted an "open systems" approach did not render this statement false or misleading.

Accordingly, the Court GRANTS the Splash defendants' motion to dismiss the SAC to the extent that it relies on statements concerning its "open systems" nonproprietary architecture. *See,* SAC ¶¶ 88–89, 92–93.

**B. *Scienter***

As discussed earlier, "under the standard articulated by the Ninth Circuit, plaintiffs must allege facts sufficient to create an inference of, at a minimum, deliberate recklessness." *Autodesk,* 132 F.Supp.2d at 842–43 (citing *SGI,* 183 F.3d at 975).[13] The Ninth Circuit made this determination because it concluded that, in enacting the PSLRA, "Congress intended to bar those complaints that fail to raise a strong inference of intent for recklessness." *SGI,* 183 F.3d at 975. "The 'deliberate recklessness' standard best serves the PSLRA's purpose. *Id.*" This standard is stricter than the standard used in some other circuits. In particular the Ninth Circuit has rejected the standard utilized in the Second Circuit, where it is sufficient for a plaintiff in a federal securities fraud case to allege facts either showing that the defendants had both opportunity and motive to commit fraud, or constituting 'strong circumstantial evidence of conscious misbehavior or recklessness.' *Autodesk,* 132 F.Supp.2d at 843 (citing *SGI,* 183 F.3d at 974 (citing *Press v. Chem. Inv. Serv. Corp.,* 166 F.3d 529 (2d Cir.1999))).

■ In their FAC, plaintiffs sought to meet their scienter burden by (1) touting defendants' internal knowledge of Splash and (2) emphasizing defendants' "suspi-

---

**13.** For the forward looking statements, plaintiffs must prove that the defendants possessed actual knowledge that the statement was false or misleading when made. 15 U.S.C. 78u–5(c)(1)(B).

cious" stock sales during the class period. In its September 29, 2000 Order, the Court found that plaintiffs' allegations concerning defendants' internal knowledge were "unparticularized, boilerplate pleadings" and, therefore, inadequate. *Splash*, 2000 WL 1727377, *21. It found that the alleged stock sales were suspicious (1) in terms of percentage, although the length of the class period decreased the weight attributable to that factor, and (2) in terms of timing, although some only marginally so, but that allegations concerning those sales were not sufficient, either on their own, or in combination with the generalized pleadings concerning the Splash individual defendants' internal role in Splash and access to unspecified internal reports, to raise a strong inference of deliberate recklessness.[14] *Id.* at *24. In granting leave to amend, the Court specifically instructed plaintiffs that, in order "to meet the scienter pleading requirements", they would have to "specify the sources of defendants' alleged internal knowledge" with respect to each allegedly actionable statement contained in any SAC. *Id.* at *26.

Plaintiffs subsequently filed their SAC. In this document, they again attempt to satisfy the scienter burden by relying upon allegations about (1) defendants' internal knowledge of Splash, and (2) "unusual and suspicious" stock sales. The Court will consider the adequacy of their current allegations below.

### 1. *Internal Knowledge*

In their FAC, plaintiffs sought to impute knowledge of critical, allegedly omitted facts to the individual defendants by alleging that they were "hands on" managers, were in "constant contact" with Fuji Xerox and Xerox, and had "direct access" to information from Fuji Xerox and Xerox. As

noted above, the Court found this showing inadequate. In its order dismissing the FAC, the Court deemed the allegations to be "unparticularized, boilerplate pleadings". The Court noted, in particular, that the FAC relied upon the following as the source of defendants' knowledge of the critical facts: "unspecified 'internal corporate documents,' unspecified conversations with unspecified 'corporate officers and employees,' attendance at unspecified 'management and/or Board meetings,' unspecified order intake and backlog reports, unspecified disclosures and data from Xerox and Fuji Xerox, and the individual Splash defendants' 'hands-on' management" style. *Splash*, 2000 WL 1727377, *21. The Court concluded that these allegations were not sufficiently specific or particularized to raise a strong inference of deliberate recklessness in the aftermath of *SGI*, and that acceptance of such allegations "would undermine the particularized pleading requirements for scienter of the PSLRA." *Id.* (citing *SGI*, 183 F.3d at 984; *In re CBT Group PLC Sec. Litig.*, 1999 WL 1249287, *2 (N.D.Cal.1999) (J. Whyte) (finding allegation of insider awareness of unspecified negative internal reports, including order, backlog, and shipment reports, insufficient to satisfy *SGI*)).

Despite this clear ruling, the SAC does not remedy the identified deficiencies of the FAC in pleading scienter based upon defendants' alleged internal knowledge of Splash. Indeed, as the Splash defendants correctly point out, the passages of the SAC which address this subject are, with one exception discussed below, lifted word-for-word from the FAC. *See*, SAC ¶¶ 46–54; FAC ¶¶ 36–44. The SAC, therefore, still (1) does not identify the internal corporate documents to which it refers (*e.g.*, by identifying "their contents, who pre-

---

14. The Court noted, however, that it did not need to (and, therefore, did not) "definitely resolve this issue" because the FAC merited dismissal on other grounds. *Splash*, 2000 WL 1727377, *24.

pared them, which officers reviewed them and from whom [plaintiffs] obtained the information",[15] *Heliotrope,* 189 F.3d at 979), *see e.g.,* SAC ¶¶ 47, 52, 53; (2) does not identify any specific conversations between specific officers and employees, *see,* SAC ¶ 52; (3) does not identify any specific management or Board meeting at which adverse non-public information was disclosed or discussed, *see id;* (4) does not identify any specific "order intake reports", "backlog reports" or "shipment reports" that reflected such information, *see id* at ¶ 53; and (5) does not identify any specific information which specific Splash "top executives" allegedly received from specific representatives of Xerox or Fuji Xerox, or the circumstances surrounding such receipt (*e.g.,* the method by which the "information" was conveyed or received,[16] the date on which it was conveyed or received, the identity of any specific person alleged to have received or conveyed the "information" or any details concerning the "information" at issue), *see,* SAC ¶¶ 48–50, 53.

The only new facts alleged in the SAC to show defendants' alleged internal knowledge have to do with plaintiffs' prior allegation that Splash "top executives" were in constant contact with Xerox and Fuji Xerox. *See,* FAC ¶ 39. Plaintiffs now identify Kleffman, as one such "top executive" and they identify several representatives of Xerox and Fuji Xerox with whom Splash "top executives", including Kleffman, allegedly had such contact. *See,* SAC ¶ 49. As noted above, however, the SAC still does not identify any specific contact between Kleffman or any other Splash "top executive" and any representative of Xerox or Fuji Xerox. That is, the SAC does not identify a single specific communication between specific representatives of any of the three companies, the date on which any such communication occurred, how plaintiffs learned of such a communication, the form in which such contact or communication was had, or specifics concerning information provided or received during such contact. *Id.See, SGI,* 183 F.3d at 985; *Heliotrope,* 189 F.3d at 979. This is still plainly inadequate.[17] Plaintiffs' authority to the contrary comes almost entirely from cases that pre-date the PSLRA or *SGI* or that come from

---

**15.** The SAC alleges that "confidential informants" provided some of the information alleged therein, but does not specify what type of information they provided. Nor does it supply any information that the Court might use to evaluate the confidential informants' basis for alleging that the defendants had access to adverse information. *See,* SAC ¶ 49.

**16.** The SAC alleges that Xerox and/or Fuji Xerox "advised Splash" of certain general facts or "furnished Splash with 6–month and 12–month forecasts", *see,* SAC ¶ 50, but it does not specify *how* these companies advised Splash (whether in writing or orally), *when* they advised Splash, *who* at Splash they advised, or any specific details concerning *what* they stated or advised. *See also,* SAC ¶ 53 (confirming that "Xerox and Fuji Xerox ... provided" such forecasts, but not stating when or to whom or what those forecasts specifically stated).

**17.** *See, Autodesk,* 132 F.Supp.2d at 844 ("plaintiffs must do more than allege that ... key officers had the requisite knowledge by virtue of their 'hands on' positions"; a ruling to the contrary "would eliminate the necessity for specially pleading scienter as any corporate officer could be said to possess the requisite knowledge by virtue of his or her position"); *id.* ("[a]llowing plaintiffs to go forward with a case based on general allegations of 'negative internal reports' would expose virtually all public companies to potential litigation"); *In re Read–Rite Corp. Sec. Litig.,* 115 F.Supp.2d 1181, 1185 (N.D.Cal. 2000) (while one *"reasonably* could infer that [the CEO and the President and COO of a company] would be aware of major developments concerning a key customer's refusal to implement a major product line ..., under current law, the mere existence of a reasonable inference does not satisfy the [PSLRA's] requirement of a strong implication").

other circuits,[18] some of which the Court already has ruled lack binding authority or persuasive force.[19]

Accordingly, the Court concludes that plaintiffs' allegations concerning defendants' internal knowledge lack the requisite specificity and, therefore, cannot create a strong inference of "deliberate recklessness".

### 2. *Stock Sales*

As they did in opposing defendants' first motions to dismiss, plaintiffs again point to defendants' stock sales as an alternative means for imputing knowledge and scienter to them.

 "Unusual or suspicious stock sales by corporate insiders may serve as circumstantial evidence of the requisite scienter but only if the insider trading is 'dramatically out of line with prior trading practices at times calculated to maximize the personal benefit from undisclosed inside information.'" *Splash*, 2000 WL 1727377, *22 (quoting *SGI*, 183 F.3d at 986) (internal quotations and citations omitted). "Relevant factors to consider when determining whether the trading meets this standard are (1) the amount and percentage of shares sold; (2) the timing of the sales; and (3) the consistency between the sales and the insider's prior trading history." *Id.* (citing *SGI*, 183 F.3d at 986). "Context is important, especially for assessing the weight to attach to the timing of the sales." *Id.* (citing *Greebel v. FTP Software, Inc.*, 194 F.3d 185, 206 (1st Cir. 1999)). "Although viable circumstantial evidence of scienter, 'stock sales alone cannot create a strong inference of scienter.'" *Id.* (quoting *Wenger*, 2 F.Supp.2d at 1251 (citing *Silicon*, 970 F.Supp. at 768)).[20]

In *SGI*, six insider officers of the company sold 388,188 shares for a total of

---

**18.** While plaintiffs do cite to one recent case from this district, even the judge in that case agreed that "the persuasive force of each situation must be evaluated individually" and that "[r]ote allegations about 'hands on' managers and 'important' transactions should not, by themselves, be enough to demonstrate a strong inference of scienter." *In re Peoplesoft, Inc.*, 2000 WL 1737936, *4 (N.D.Cal. 2000). To the extent that the decision in *Peoplesoft* may be read as support for the proposition that plaintiffs need not provide specific details to meet their burden of scienter, *e.g.*, identification of specific internal reports or third party forecasts which managers are alleged to have received and reviewed, this Court respectfully disagrees. *See, SGI*, 183 F.3d at 985 ("in the absence of such specifics, we cannot determine whether there is any basis for alleging that the officers knew that their statements were false at the time they were made—a required element in pleading fraud").

**19.** *See*, Pls.' Opp. to Radius and Berger Motion at p. 18 (citing, *inter alia, In re Ancor Communs.*, 22 F.Supp.2d 999, 1005 (D.Minn. 1998)). *Compare, Splash*, 2000 WL 1727377, *21 (discussing the approach proposed in *Ancor Communs.*, and specifically rejecting it as "not likely viable in the aftermath of *Silicon* ...").

**20.** In opposing defendants' motions to dismiss their FAC, plaintiffs cited *SGI* for the proposition that insider trading alone could be sufficient to prove scienter. The Court rejected this argument, noting that, in the passage of the decision cited by plaintiffs, the Ninth Circuit merely held that insider trading in suspicious amounts or at suspicious times could be *probative* of scienter. "Probative and sufficient are not synonymous." *Splash*, 2000 WL 1727377, *22 n. 15. Plaintiffs now contend that the Ninth Circuit, in *SGI*, cited with approval certain district court decisions in which stock sales were held to be sufficient on their own. (Pls.' Opp. to Radius and Berger Mot. at 13:14–14:6) Plaintiffs direct the Court's attention to *Friedberg v. Discreet Logic*, 959 F.Supp. 42, 51 (D.Mass.1997), and *Voit v. Wonderware Corp.*, 977 F.Supp. 363, 374 (E.D.Pa.1997). Neither decision supports plaintiffs' position, however, because both decisions rest a scienter conclusion on stock sales *plus* some other circumstantial evidence of scienter. *See, Friedberg*, 959 F.Supp. at 51–52 (finding that amount and time of stock sale plus "other evidence provided sufficient circumstantial evidence of

$13,821,053 in proceeds. At the end of the class period, which lasted about 15 weeks, the six officers collectively retained 90% of their available holdings. *SGI*, 183 F.3d at 987. Four of the officers sold less than 8% of their available holdings. *Id.* The remaining two officers sold 43.6% and 75.3% of their holdings respectively. In analyzing the sales collectively and individually, the court contemplated that any individual's sales could give rise to a strong inference of deliberate recklessness on the part of that individual alone or the other directors. *Id.* The court concluded that neither the group's sales collectively nor any individual sales gave rise to a strong inference of deliberate recklessness as to any individual or any group. *Id.* at 987–88.

### a. *The Principles*

#### (1) *Platt*

 Platt sold 31.32% of her holdings [21] in Splash stock during the Class

Period for total proceeds of $1,338,550. (SAC ¶¶ 64–65, 67) She sold a total of 47,500 shares during this period. (SAC ¶¶ 64–65) This total consisted of (1) 10,000 shares in connection with the August 1997 Secondary Offering, (2) 12,500 shares upon the expiration of the lock-up arising in connection with the Secondary Offering, and (3) 25,000 shares on July 20, 1998.

#### (2) *Macgillivray*

Macgillivray sold 25.17% of his holdings in Splash stock during the Class Period for total proceeds of $2,285,415. (SAC ¶¶ 64–66) He sold a total of 83,629 shares during this period. (SAC ¶¶ 64–65) This total consisted of (1) 43,000 shares in connection with the August 1997 Secondary Offering, (2) 5,000 shares on May 14, 1998, and (3) 35,629 shares during a 7–day period between July 17 and July 24, 1998.

#### (3) *Group* [22]

As a group, these individual defendants sold 131,129 shares over a 92–week period

---

conscious misbehavior"); *Voit*, 977 F.Supp. at 374 (noting that "Plaintiff does not rest his scienter pleading solely upon allegations of insider trading", but rather alleged also that defendant made stock purchases with "inflated … stock while intentionally withholding adverse, material information").

**21.** The Court includes the individual Splash defendants' stock options in computing this percentage. *See, Splash*, 2000 WL 1727377, *22, n. 16. The Ninth Circuit has held that "the proportion of shares actually sold by an insider to the volume of shares he could have sold is probative of whether the sale was unusual or suspicious." *SGI*, 183 F.3d at 986 (citing, *inter alia, In re Worlds of Wonder Sec. Litig.*, 35 F.3d 1407, 1427 (9th Cir.1994)). Based on this reasoning, the Ninth Circuit saw no reason in *SGI* "to distinguish vested stock options from shares [since] vested stock options [could] be converted easily to shares and sold immediately." *Id.* Plaintiffs similarly have offered no convincing reason to distinguish between vested stock options and shares in this case. The fact that the vested stock options were repriced after the end of

the Class Period has no bearing on whether the defendants could have sold those options during the Class Period.

**22.** All claims against former defendants Kleffman and Beheshti have been dismissed with prejudice. *See, Splash*, 2000 WL 1727377, *25. Plaintiffs nevertheless include the stock sales of these individuals in their attempt to meet the scienter burden. In evaluating scienter, the PSLRA "requires the Court to consider each defendant's sales separately." *Silicon*, 970 F.Supp. at 767 (citing 15 U.S.C. § 78u–4(b)(2)). *Accord, Copperstone*, 1999 U.S. Dist. LEXIS 20978, *47. The Splash defendants construe this requirement to mean that the alleged stock sales of non-defendants are not relevant to the determination of defendants' scienter. *See,* Defs.' Motion at p. 19. Plaintiffs do not respond to, or even acknowledge, this argument. The SAC does not allege specific facts, however, indicating that either Kleffman or Beheshti personally possessed non-public adverse information. Accordingly, the Court finds no reason to consider their sales in determining the scienter of the named

for $3,623,965 in proceeds. Approximately 40% of these sales occurred in connection with the Secondary Offering. Another approximately 10% occurred in the days immediately following the expiration of the lock-up arising from the Secondary Offering. The remaining 50% occurred (1) on May 14, 1998(4%), and (2) over a 7–day period between July 17 and 24, 1998(46%). At the end of the Class Period, the group retained 61% of their holdings.

### b. Analysis [23]

#### (1) Amount and Percentage

The amount of shares sold, whether individually or collectively, is not suspicious in this case in that the collective proceeds were $3,623,925, significantly less than those presented to the Court in the context of plaintiffs' FAC, and slight when compared to the nearly $14 million in proceeds deemed not sufficiently suspicious in SGI. The Court previously found, however, that the percentage of shares sold by the individual defendants (31.32% and 25.17% of their respective holdings) did appear somewhat suspicious, and the Court reaches the same finding when it considers that the group sold 39% of their available holdings. As it noted in its prior ruling, other courts, "albeit applying more forgiving pleading scienter standards, have found lower percentages at least suspicious." Splash, 2000 WL 1727377, *23 (citing Voit v. Wonderware Corp., 977 F.Supp. 363 (E.D.Pa. 1997) (71.9%, 14.9%, and 10.6%); Friedberg v. Discreet Logic, Inc., 959 F.Supp. 42 (D.Mass.1997) (12 % collectively among five individuals but 33% and 50% respectively for two of the individuals); Marksman Partners, L.P. v. Chantal Pharmaceutical Corp., 927 F.Supp. 1297, 1313 (C.D.Cal.1996) (20%)). Cf., SGI, 183 F.3d at 987 (sales of 43.6% and 75.3% only "somewhat suspicious"); Wenger, supra, (sales of 26%, 38%, 25%, 32%, 100%, 91%, 65%, and 36% not suspicious).

The Court notes again, however, that the length of the Class Period in this case (approximately 90 weeks) is "a major mitigating factor" in this finding, which provides a basis for distinguishing the percentage of the shares sold in SGI, where the class period consisted of a mere fifteen weeks. Splash, 2000 WL 1727377, *23. See also, In re VISX, Inc. Sec. Litig., 2001 WL 210481, *8 (N.D.Cal.) (stock sales during 50 week class period netting the following amounts for the named defendants: $51.8 million, $12.1 million, $6.8 million, $13.7 million (each for three defendants), $8.4 million, and $4.1 million raised only "some suspicion").

#### (2) Timing

In its earlier ruling, the Court noted that "[c]ircumstantial temporal evidence in support of a finding of scienter can arise from the 'temporal proximity between an alleged misstatement and the later disclosure of inconsistent information.'"

defendants. See, Plevy, 38 F.Supp.2d at 834 n. 12 (finding the stock sales of insiders not named as defendants "irrelevant to alleging scienter against the five named Defendants"); In re PETsMART Sec. Litig., 61 F.Supp.2d 982, 1001 (D.Ariz.1999) (finding "no reason to consider" the stock sales of individuals not named as defendants absent "specific facts suggesting that defendants intended their manipulation of [company] stock to assist these specific colleagues"). The Court also does not consider Splash's sale of its own stock during the Class Period because the SAC does not allege that this sale was the result of insider trading or that it inured to the personal benefit of any of the individual defendants. See, SGI, 183 F.3d at 986 ("insider trading is suspicious only when it ... [occurs] at times calculated to maximize the personal benefit from undisclosed inside information").

**23.** Because the Class Period commenced early in Splash's existence, the Court cannot compare the sales in this case to the individual defendants' prior trading history of Splash stock.

*Splash,* 2000 WL 1727377, *23 (quoting *Friedberg,* 959 F.Supp. at 51; *Greebel v. FTP Software, Inc.,* 194 F.3d 185, 206–07 (1st Cir.1999)). "Another relevant factor when assessing the timing of a sale is the price at which the sale occurred since such evidence can bear on whether defendants deliberately attempted to seize on artificially high prices." *Splash,* 2000 WL 1727377, *23 (citing *Plevy,* 38 F.Supp.2d at 835).

Applying these factors, the Court found that suspicious timing was generally absent on the facts presented in the FAC. *Id.* With respect to the August 1997 sales, the Court first noted that plaintiffs had failed adequately to plead the existence of any fraudulent statement in the Prospectus and Registration Statement for the August 1997 Secondary Offering. *Id.* at *24. In addition, it noted (1) that the value of Splash's stock continued to climb after the defendants' August sales to a highwater trading mark on October 24, 1997 of $47.688 per share (more than $16 above the amount the defendants' received), and (2) that there was a delay between defendants' August 1997 trades and the subsequent onset of the Splash stock's decline (in December 1997). Given these facts, the Court found the timing of the August sales insufficient to satisfy the scienter pleading standard. *Id.* Plaintiffs have alleged no new facts in their SAC to justify a different ruling on the current motions to dismiss. The SAC (in contrast to the FAC) does not even allege the existence of a fraudulent statement in the Prospectus and Registration Statement for the Secondary Offering. Nor have plaintiffs alleged any new facts to demonstrate that defendants' August 1997 trades were "calculated to maximize the personal benefit from undisclosed inside information". *SGI,* 183 F.3d at 986.

With respect to the November 1997 sales, plaintiffs contended in opposing dismissal of the FAC, and contend again now, that scienter is demonstrated by the fact that the sales took place just three weeks before EFI's announcement that its earnings would be less than projected, and seven weeks before Splash announced that its growth had slowed. The Court rejected these arguments in its prior order because the FAC provided no indication that "any defendant had inside information concerning the information in the EFI announcement prior to the actual announcement", and "[t]he suggested link between the November trading activity and [Splash's December announcement was] insufficient by itself to satisfy the PSLRA's strict pleading requirements." *Splash,* 2000 WL 1727377, *24. Again, plaintiffs have alleged no new information requiring a different result.[24]

In its prior order, the Court did find the "heated trading activity in July 1998" to be suspicious because of the high volume, and the temporal proximity of the trading to the subsequent decline in stock value (beginning in September 1998) and Splash's disclosure of negative news (in October 1998). *Id.* (citing *Friedberg,* 959 F.Supp. at 51–52 (emphasizing the temporal proximity—as large as two-and-a-half months—of the stock sales and the announcement of the negative news as circumstantial evidence of conscious misbehavior)). *Cf., Wenger,* 2 F.Supp.2d at 1251 (stock sales not suspicious where "none of the sales occurred at suspicious times such as immediately before a negative earnings announcement"). As a whole, however, the Court concluded that the stock sales were not sufficient, either by themselves, or in combination with the FAC's generalized pleadings concerning the Splash individual defendants' internal knowledge, to

24. *Compare,* SAC ¶¶ 66–67; FAC ¶¶ 56–57.

satisfy the pleading requirements for scienter established by *SGI. Splash,* 2000 WL 1727377, *24. Because plaintiffs' allegations in their SAC are very nearly identical, the Court reaches the same finding with respect to it. Despite having had leave to amend, plaintiffs still have not met the standard for pleading scienter.[25]

Accordingly, the motion to dismiss must be GRANTED. Because the Court concludes that further amendment would be futile, the claims against the Splash defendants are dismissed with prejudice.

### C. *Control Person Liability*

 If the SAC fails to state a claim against Platt and Macgillivray for their individual statements, plaintiffs rely on one final alternative theory: control person liability. The SAC alleges that Platt and Magillivray were control persons of Splash by virtue of their stock ownership and management positions. (SAC ¶ 175)

> Section 20(a) of the 1934 Act provides: Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t(a). "To establish 'controlling person' liability, the plaintiff must show that a primary violation was committed and that the defendant 'directly or indirectly' controlled the violator." *Paracor Finance Inc. v. General Electric Capital Corp.,* 96 F.3d 1151, 1161 (9th Cir. 1996). As noted above, however, plaintiffs

have failed to allege with particularity that a primary violation was committed. Accordingly, their claim based upon "control person" liability also must be dismissed. Dismissal of this claim also shall be with prejudice for the reasons set forth above.

### IV. *CONCLUSION*

For the foregoing reasons, the Court hereby GRANTS Defendants' Motion to Dismiss, and ORDERS that the Second Amended Complaint shall be dismissed with prejudice.

IT IS SO ORDERED.

---

**25.** In light of its conclusion that plaintiffs have not adequately pled scienter, the Court need not (and does not) address the issue of whether the Splash defendants may be held liable based upon the reports of third party analysts.